and Council for the Appellant, Ms. Kramer. Good afternoon and may it please the Court. My name is Mary Kramer with the Murphy Law Group and I am here on behalf of the Plaintiff Appellant, Tondelea Davis.  You certainly may and I'm happy to see you here. I was confused about which council was not here. So it's Council for Elwyn who we have remote. Okay. All right. Ms. Kramer, please proceed. Thank you. Your Honors, it's well settled that when the relevant question is how an ordinary person would make an assessment, the jury is generally the decision maker that ought to provide that fact-intensive answer. But when the district court provided its 25-page memorandum granting defendant appellees Elwyn's motion for summary judgment, it made the error of taking the reasonable jury's right to be the decision maker away. Let me ask you a couple of questions along those lines. Is there anything in the record from a medical professional or the like describing the cognitive abilities of someone who has a mood disorder, an impulse control disorder, along with a borderline personality disorder? Is there anything in the record with regard to that? The record doesn't get into his cognitive abilities. And for purposes, we refer to this patient as patient X. Yes, yes. So patient X, it doesn't get into his cognitive abilities. As you mentioned, it gives his diagnoses, but it doesn't get into his level of education or anything to that extent, if that answers the question. Well, what I'm trying to figure out is there are conclusions made in the record about what a reasonable worker would have to confront. But there doesn't seem to be in the record evidence with regard to what someone in this particular medical space, if you will, who has mood disorder, impulse control disorder, and borderline personality disorder, what can be or should be expected with regard to the degree of volition that one acts with, et cetera. And I wanted to make sure that my reading of the record was correct and that there was nothing in the record with regard to that, then leading to the question of what a reasonable person should expect. So help me about the development of the record and what's in there. So Ms. Davis did testify that this is not her first job. Owen was not her first job. She's worked in the mental health field before. She has worked in the mental health field since being fired from Owen. She has not had these experiences as she did with patient X since then or before being with patient X. He is the only one who constantly has used language such as calling her the N-word, calling her an orangutan, calling her the help. Is she working in a locked-down psych ward now? It is not a locked-down psych ward. This Owen, where she was working, was a locked-down psych ward, right? Yes, but it was a 12- to 24-month facility to get people back into the... ...to get people back into the community. Yes, but the idea, I think it's acknowledged in the briefing, I don't think this is a matter of dispute, is this is not, you know, a mental health clinic where you come in and you visit with a counselor or with a doctor and you have some help with cognitive behavioral therapy or maybe a prescription for a needed medication and you leave. This is a locked-down psych unit because the behavioral problems, the mental illnesses are so profound that people cannot be trusted to be outside of a locked-down facility, right? That is Owen in general. New Beginnings, which is the department within Owen, is supposed to... It's supposed to help people transition, but it's... I don't want to keep repeating myself, but it's still a locked-down psych facility. Correct. Okay, and that's... And he was supposed to transition. I'm sorry. I'm just... Does that speak at all to what Judge Greenaway was asking you? Does that communicate something to a worker about what you're entering into? Yes, but that shouldn't indicate that someone assumes the risk that they are constantly going to be verbally assaulted without any support from their supervisors. No, I think the question is slightly different. We totally get that, right? The question is, is there within the profession an expectation of a particular... In the profession? Well, I'm calling it a profession. I don't know what else to... Okay, I just thought... The job description. Okay, I'll say your question. Someone working in a psych ward that there will be particular behaviors that are so well-known that they should be expected. And that's why I asked you at the beginning whether there was any medical testimony in the record so that it would tell us and any reader of the record that these are the things one should expect when a person, patient X or someone else, is housed in this kind of unit. Okay, so there is no medical testimony other than just the behavioral plan. So there is no clear indication of what to expect within this unit. Every patient would be different. And I don't want to misrepresent it. Language has been used before, but just not to this extent. This patient was unique unto himself. Was really bad, yeah. Correct. Now, it's also in the record, isn't it, that your client knew that in advance. She'd been warned, oh, you're going to Elwynn's New Beginning. Patient X is there. He's really horrible. Or worse to that effect. I believe I saw that in the record. Isn't that a fact? I think it was something along the lines of they have a troubling patient or a challenging patient. Yeah. She'd heard about him before she went to the job. Correct. And she testified that in prior places she worked, if they had a troubling patient, they would go talk to their supervisors and receive help from their supervisors. And she did testify, I believe, that she got help from her supervisors insofar as there was a custom and practice accepted that workers like Ms. Davis could tap out, I think is the word that was used by both sides in their briefing. They could go and say, look, I've had my fill of the abuse today. Somebody else needs to deal with them for a while. And that was something that the supervisory powers at New Beginnings allowed workers to do. Correct? In theory they allowed it, but then in practice it led to Ms. Davis' termination. Well, we're aware of at least one instance where they said, no, don't tap out. But it is fair to say, isn't it, that that was a generally followed protocol? Again, even Jamal Mack also testified that if Patient X was involved, no one actually was able to do what needed to be done. Sure, that's not my question. Just stick with me on my question. We're aware that there is the occasion, the very, very distressing occasion, to put it mildly, where Mr. Moody does not back up Ms. Davis and say, go ahead, tap out. He tells her to suck it up, basically. Yeah, he says to her, in essence, just go take care of it and be done with it. But the way I was reading this record, it appeared to me that tapping out was generally accepted and allowed and followed. That's the only question I'm asking you? Yes. Okay. Okay. Now, if my colleagues will allow me one more question, pretty specific here, about your legal position. Assume for the sake, well, maybe I should start by asking this. It looked like the record was such that the water bottle incident was the only physical touching battery kind of event, that the other interactions with him were the terrible verbal abuse, the sort of grinding mental thing of dealing with somebody who's just foul to you day in and day out. Am I correct about that? The water bottle is the physical event? That's the only physical event that there is record of. Okay. What about the grabbing? Did he grab her at other occasions, slap her on the butt, that kind of thing? We don't have recorded evidence of him ever touching her physically. She would say he would shove her, push her, but we don't have. That's what we're trying to get at, was the physical touching, other than the bottle incident. Nothing that we can explicitly point to. Well, wait a minute. I'm confused. You mean nothing that's on tape? Correct. Or you mean nothing that happened? Testimony. There was a testimony about it. Wasn't it on video? I can't point to anything off the top of my head if there is testimony, so I apologize. Okay. We'll assume for the sake of discussion that the water bottle incident was the one incident. Right. And we just set that aside, not to minimize, and please, none of the questions that are being asked should be taken as indicating that I or anybody has taken lightly the kinds of verbal harassment, abuse via language, because we don't take that lightly. But if that language is the only thing, and I know only is pretty big only, but if that's the only thing, do you have legal support for the assertion that that creates a hostile work environment in an environment where, by definition, you're going to face abusive language because you have people without impulse control? It's why they're in a lockdown psych unit. So just to use your words, the language is only what is happening. The frequency of it, the fact that it's every shift that patient X is awake while Ms. Davis is on the shift, it is our position that there is enough for a reasonable jury to find that that created a hostile work environment, regardless of- And what was the alternative? Is it the case then that, you know, not to get too hyperbolic about it, but what's the answer then? Is the state and institutions like L1 supposed to turn patient X out into the street? Like, get out, because you cannot exist in this environment without creating a hostile work environment and causing liability for us. Nobody else is going to take you. Norristown Hospital won't take you. The police won't arrest you and commit you because they say you should be able to do it. But that's all in the record, right? Norristown wouldn't take them. The police wouldn't arrest them. They called on these 302 calls, and they'd say, we're not taking them. So is the upshot of your legal position that somebody like patient X is simply untreatable, unhousable, needs just to be turned loose on society generally? Well, in theory, he was going to be eventually, right? So they had to- Don't talk about in theory. I mean, we're talking about right now, the guy's in lockdown. It's happening. It's terrible every day for Ms. Davis and her coworkers. Is the legal position you're taking, if we were to adopt it, making it functionally impossible to house patient X? So Ellen's position is that they changed his treatment plan, but where's the evidence that they did change his treatment plan? We don't know what they actually did to help their employees. They didn't- He's incorrigible. Take it out of this case if you want to. Take it as a hypothetical. Patient Y, absolutely, in the literal sense of the term, incorrigible. There's no impulse control. You cannot stop the verbal abuse. It may not be diagnosed as Tourette's, but it just flows out of this person constantly. Is the legal position you're taking, that person's unhousable. You can't do it because, by definition, it's a constant stream of vile filth. Right. So I'm not a medical professional, so I don't know if medication changes would help, but we don't know if they tried that. We don't know what they did. You're missing my point, and I apologize for interrupting. I don't want you to say they could have done something different. I'm asking you to accept for purposes of the hypothetical that everything you've tried hasn't worked. In the literal sense of the word, incorrigible. You cannot change the behavior. Is the legal position you're giving us one that means the worst case people, maybe the ones who most need to be institutionalized, cannot be institutionalized? Because if they're institutionalized, the workers will have a hostile work environment claim. I think the question you're asking just proves that it is a question for a jury to decide how to proceed. What did Mac say about Patient X? I'm sorry? What did Mac say about Patient X, who's a healthcare professional? Mac said that Patient X did not belong in the program. Now, we don't know why he said that. Maybe just because he couldn't handle him? Maybe he, Mac, could not handle X? Maybe Mac thought that in terms of making a diagnosis, this is the wrong place to put him? But there's stuff on the record that I'm not sure you're really focusing on answering these questions. I do know that Mac said Patient X didn't belong there. I believe he said it was because Patient X was behavioral, not because of a mental disorder. I don't know what that means. I don't know. It seems to me behavioral and mental. I didn't understand that. Let me just follow up with a question on both of my colleagues' points. At one point, I thought you were going to say, well, the change is out of new beginnings, not out of L1. Right. If I'm understanding correctly, and you'll correct me if I'm wrong, at the point in time that Ms. Davis was working with Patient X, he was in a new, he was in whatever, the unit or program called New Beginnings, and that was supposed to be a transition program, as opposed to someone who was going to be permanently housed at L1 in the, whatever, the involuntary section, whatever. Right? New Beginnings is the beginning of a transition. Is that right? That's my understanding. So in answering Judge Jordan's question about putting him out in the hypothetical pose, he was, Patient X was in New Beginnings. There's something more restrictive than New Beginnings that he could have been placed in. Is that right? I believe so. What is it? Where is that in the record? The only thing in the record I see is Norristown, which is the hospital where you're committed, right? And they won't take him. Is there another option that's not in the record that we should be knowing about? No, I apologize. That's not in the record. So it's just New Beginnings is the transition facility within L1 to get you back into the community. But L1 is a bigger facility. So L1 has another facility that's more restrictive than New Beginnings? I think New Beginnings is the least restrictive within L1. Okay. Is the fact that there are other facilities more restrictive, is that in the record? You tell us. It's not in the record. Okay. Okay. Well, thanks. We'll have you back on rebuttal, Ms. Kramer. Thank you. We'll give Mr. Kowalik, I hope I'm saying your name right, sir, his opportunity to speak on behalf of L1. You're on mute, sir. You're on mute. You've got to unmute. Now you're very faint. Now you're very faint. Turn up your volume if you can, and let's turn the volume up in here. Hi, judges. This is Greg over Zoom. Mr. Kowalik, perhaps your headphones are causing the problem. It might not be picking up the microphone. Okay. Is that better? That's somewhat better. You'll have to keep your voice up. You know, I will speak up. I need to use the headphones because I'm a little hard of hearing, and I apologize for all these problems. Your Honors, Yeah, you've just, we've lost your sound completely. So I don't know whether you have to take that headphone out or not. Please speak now. No, it's as if you're on mute. I think you are on mute. The little red rectangle is lit up. I can't read it from here. I think that means you're on mute. Mr. Kowalik, it might be helpful if you disconnect and reconnect. Okay. Wait, now you're there. You're there. Now we hear you again. Yeah. Just at this point, just keep talking. Don't. Don't do anything except make your pitch. Okay. Don't touch anything. Yeah, please. And as I was saying, it's a 24-hour residential secured facility. And with regard specifically to this case, patient X was someone who was in need of that type of supervised care and had significant and severe behavioral and mental health issues. That resulted in the kind of activities that he unfortunately inflicted on the staff. But did he belong there? That's my concern. Did he belong there? Because it is a stepped-down facility. And Ms. Kramer said that it wasn't in the record that Edwin has other more restrictive units. But Mac clearly said that this guy didn't belong there. Patient X didn't belong there. And it may be that nobody else at Elvin was willing to take him, but that might go to the liability of Elvin. I just don't know. I don't know why Mac was saying that he couldn't get patient X out of the program. But Mac, who is a trained professional, clearly said that patient X did not belong at this stepped-down type of facility. Well, I don't think that the record was developed on that point. It wasn't developed, but it's there that Mac said that. It wasn't developed. And if it isn't developed... I understand. But my larger point is that, you know, not appropriate for this facility, but based on what? Is it based on his behavior? Is it based on the potential for rehabilitation? There may be many reasons why this program wasn't appropriate. Or maybe the best fit is a better way of putting it. Yes, this wasn't the best fit for him, but that doesn't change the nature of what happens in these programs. When you say the nature of what happens in the programs, I want to ask you and Ms. Kramer about that. The district court says at one point in its opinion that patient X's conduct was not objectively severe or pervasive because it is par for the course at psychiatric facilities like Elvin. What is the district court relying upon for that, other than the district court's own view of psychiatric facilities like Elvin? Is it something which he can take judicial notice of? Yes, I mean, I think it can be properly extrapolated from the facts that are on the record. We don't have anywhere a one-to-one comparison between patient X, patient A, patient B, to say, okay, well, he's doing the exact same thing that these other people are doing. Yes, but what is the court supposed to extrapolate from? Tell us. Extrapolation, that's new on facts. Help me. We do have on the record material about patient X and why he is acting the way he is. This isn't someone who just is doing this, you know, the way a normal person would. That's not the point that Judge McKee is making with you. That's not the point. You've got to, particularly since you've chosen to appear remotely, sir, you're going to have to pay attention to when voices are coming in at you, and even if necessary, stop mid-syllable so that the questions can be put to you. Go ahead, Judge Green. The point that Judge McKee was making is what's in the record. We understand that patient X has a certain behavioral characteristics. We understand what the diagnosis was. But what Judge McKee read to you from the opinion was a broader statement that appears to be based on a general understanding of what occurs in a facility like yours, and what we're trying to inquire about is what in the record would allow the district court to write with such a broad stroke. So the question is what evidence is there specifically about how one should expect patients in a facility like yours to act? I think that the testimony of the plaintiff herself in part fulfills that role because she discussed her previous role, her previous job, what she experienced there, and the process by which she came to be employed by Elwin, and it basically revolved around patient X. They were having difficulties and they thought that she would, by the basis of her previous experiences, that she would be a perfect fit. But doesn't that cut against you? If it's all around patient X, and the record does show, I'll just give one little quote from, again, from Director Mack. He said there was a high turnover ratio due to staff getting fired for defending themselves and placing their hands on patient X. There were many staff members who were assaulted. Staff were extremely frustrated. And, of course, as their leader, I was just as frustrated, and I felt helpless and hopeless that I could not help my staff, and I had to continuously tell them it was going to be okay, it was going to be okay, and it wasn't okay. This is not the plaintiff. This is the person running the program, the director of New Beginnings, giving what looks like pretty damning testimony against Elwin. If the director of the program is saying this is a super problem with patient X, how does it come to the point where the district court judge can say, at summary judgment, when the lens is supposed to view the facts in the light most favorable to Ms. Davis, that this is just par for the course, this is just what people should expect. It sounds like nobody expected it. The director didn't expect it. The staff didn't expect it. You just said yourself it comes down to problem with patient X. Evidently, this isn't the sort of thing you just expect, or at least as a district court judge using the summary judgment lens, you might say, if I'm looking at this in the light most favorable to the plaintiff, I could say this was not expected in the workplace. Am I wrong about that? I would say that yes, because what this demonstrates is a preexisting, essentially a preexisting condition with patient X's behavior. Well, we're kind of talking across purposes. We're talking across purposes. Stop for a minute. You don't get to say no, no, no to me. I know this is not the normal stuff, right? If you and I were sitting down and we were chatting at a pub, you could say no, no, no, and I'd be perfectly quiet, but we're not in that setting. There are many times that I miss Judge Slogar. Your gesture just triggered in me a real fondness for Judge Slogar and the way she dealt with it. Yes, she might not have taken that so lightly. But here's the question that I'm trying to ask and maybe asking inartfully, and I think it kind of goes to what my colleagues are asking. The testimony in the record I just read to you, your own statements here indicate that patient X isn't run-of-the-mill. He's anything but run-of-the-mill. He's an extraordinary and very, very hard case. So how is it that the district court can say this is the sort of thing you just expect when you work in a psych hospital? How do those things square up? I would say that this was he had a condition that was excessive to a degree and not too kind, and by that I mean his actions may have been worse than the average run-of-the-mill patient, but they were in line with what they were doing. And more importantly here were the plaintiff's claim. She's claiming that it was based on sex and race-based discrimination, that that's the basis of the hostile work environment. And when you have multiple people, presumably of all races and all sexes, saying this guy is a problem, what that does is cuts against the plaintiff's claim of she can't just prove that her workplace was hostile. She has to prove that the hostility was based on sex or race. And here when you have men, women of all races saying this guy is a problem, his mental illness is such that he is a number to work with, and so we're trying to find the best person that we can in order to deal with his problems, that's where I think it cuts against her claim, and that's where I think that the judge can be justified in saying that it's a problem. What in the record, he uses very specific words that could only be used for a person of Ms. Davis' gender and race. The judge makes a one-line reference to the point that he used derogatory statements towards some Caucasians, but I don't know where that is in the record. The fact that they're vile I think is a given, you'd agree with that, but what I don't hear in the record is that they were pervasive as to others in that work environment. What I also don't hear, more importantly, is that with regard to other patients, there's something in the record that says this type of behavior is one that all workers could expect from patients of this ilk. That's what I'm not hearing. Did I miss something in the record? I think that the, well, I think, number one, that there's no indication, or what they're expected to be, that this type of vile behavior that he engages in is engaged in by other patients, that each one has their own individual peculiarities. I think that there is some indications in testimony, I think, again, from Plaintiff herself, indicating that he would use the same sort of vile words and slurs against other people and not just her. I also think that there's an indication in his treatment plan to that effect as well. Let me ask you something from your answering brief. You say on page 27 of that brief, quote, Plaintiff argues that the district court does not address the fact that when Davis did attempt to tap out on June 18, 2019, she was ignored and ultimately terminated. However, this is simply not true. When Plaintiff expressed to her supervisor, Adam Moody, that Patient X was acting in a defiant manner by refusing to change his bed, Mr. Moody specifically instructed her how to de-escalate the situation, et cetera. Now, I'm struggling with this a little bit when you say this is simply not true, when as I read it, just to put the background facts on this, and viewed in the light most favorable to Ms. Davis, you know, I'm sure if we had Mr. Moody in here, he'd tell a different story, but viewing it as we need to from her perspective, and this isn't, as far as I know, contested by Elwin at this point, she was locked in a real contest of wills with this disturbed patient who is evidently, despite his disturbance, manipulative enough to understand exactly what he was doing in this context. He had soiled himself, he'd soiled his bed, and he demanded that she and no one else literally clean up his crap, literally deal with his feces. And when she said, no, you can do that yourself, he said, no, you'll do it or I'll see you get fired. And when she went to Moody for help and said, that's it, I got to tap out, what you characterize as support for her is Moody saying, you go back and deal with it. In other words, no tapping out, knuckle under, and go ahead and be his N word made, which is the word he used, not Moody, patient X. Go back and be, yeah, deal with it yourself. That's the context in which you say it's simply not true that when Davis tried to tap out, she was ignored and ultimately terminated. Because viewed from her perspective, it looks like that's exactly what happened, that in the most egregious of circumstances, Moody's response wasn't, that's terrible, you can tap out, and in fact there is somebody else ready to take care of the problem. But patient X says, no, it's got to be you, Davis. And Moody backs up Davis. Now, those are the facts we've got, and that's the basis on which summary judgment is granted. There's more to the record than that. I'm just a little mystified, though, by your assertion that it's not true, when viewed in the light most favorable to Davis, that Moody did not allow her to tap out. Because that's exactly what it looks like happened, and that when she refused to be further humiliated, he fired her. Have I got my facts wrong, or is that in fact the way, in the light most favorable to Ms. Davis, the facts at the time of termination stand? I think that the one factor that's very important here is from plaintiff's own testimony, where she said she was willing to go back in the room and supervise patient X putting the rubber sheet on his bed. But she was unwilling to do it herself, as Mr. Moody directed her to do so, because it was her belief that the treatment protocol that Elwin wished to have happen is for these people to become more and more self-reliant. So by doing that, now- I don't think you're answering my question. I know you're giving me more facts- Which are not helpful. Which, candidly, are maybe not as helpful for you as you think. But my question is, when she goes to Moody and says what she says to him, she's asking to tap out. I don't even think that's contested. Maybe you are contesting it now by saying she said after conversation with Moody she could go back and do something. But she was trying to tap out, and he wouldn't let her. Isn't that a reading of the record, which at least at the summary judgment stage, we're required to take? Well, I don't think that there's any indication in the record that tapping out was something other than an option. I don't think that there was any indication in the record anywhere that says that the employees could go to their supervisor and simply by saying, I want to tap out, can be excused from doing their job. How do you tap out? We're not talking about a judo match where you go like that on the mat. How do you tap out in this context? Well, I think that what she made her point known to Moody, and his understanding presumably was the same as hers, is that her position is that she wanted Patient X to do the work. And that was really the only dispute here. Who was going to change the bet, Patient X or the plaintiff?  When you say that was the only dispute, that's the only dispute in the sense that there's who's going to do it, if you frame it that narrowly. But I've just given you all the background facts on the record here to get you to confront the fact that it's not just who's going to change a bet. It is a question of a hostile work environment where someone is being told, you're my N-word maid. I'll get you fired if you don't pick up my crap. That's the context. Now, in that context, it's not just who's going to make the bet, is it? I mean, we're asking the question of hostile work environment. Is there anybody on the planet who would look at that and not say, well, that's a horrifying circumstance? It is, but he is a mentally ill individual. He sure is. That's the key distinction here. No, the question is Moody's behavior at this point. That's why I'm asking this question. The question about hostile work environment isn't just about X's bad behavior. It's about Elwynn's responsibility to do something to protect its employees from patient X's bad behavior. And Moody, in that context, says, go back in there. You do it. Is that not something which a rational jury could look at and say, well, that's terrible? That's just, don't get much more hostile than that. And that's why I think her testimony that the issue that she was confronting at that moment was about whether she would do the work herself or whether she was willing to supervise him, because that then becomes what the issue that Moody had to face was. And I think that Moody, in that situation, could simply say, look, you know, we know all you want to do is supervise, but just go change it. Let's get past this initial confrontation. We'll deescalate the situation so that the ongoing hostility from patient X is thereby reduced and we handle the problem. That, unfortunately, in these type of institutions, is the kind of things that people have to face day in and day out because of the mental illness factor. Okay. Okay. So I have a question for you. On page 24 of your brief, you say the response to patient X, are you reaching for it? Do you want me to wait? I am. I have it. All right. Page 24. The response to patient X's conduct was robust, appropriate. And the only thing I was able to discern from the record is that you adjusted patient X's treatment plan. Number one, is that, am I missing something? Did you do something other than adjust the treatment plan? And then number two, what was the adjustment and how did it constitute a robust response? Yes. The response is to make the appropriate corrective treatment actions. In other words, how he is treated, how he is, the aides working through his everyday activities of daily life. A perfect example would be, you know, this that we're talking about. Is he responsible for cleaning up his own messes or does someone clean them up as well? As he becomes more, the theory behind this, I think, is that the more he becomes acclimated to the treatment and reaches an equilibrium, that his deviant behavior would go down. And that's what they attempted to do. And I think the record has indications that there were multiple changes in the way he was treated. I don't think that the, I don't know that there is the medical history in there that details it though. Okay. All right, thanks. Well, we gave you some significant additional time and questions. Appreciate your answering those. We'll go ahead and give the podium back to Ms. Kramer for her rebuttal. Thank you, Your Honor. Thank you. I wanted to address the idea that Alwyn's response was appropriate as it should have been because. It was robust and continuing. Thank you. Because when the district court responded at Superior, it just point blank accepted everything Alwyn said it did. It did not want to second guess. Well, did you have, did you put anything in the record that said they didn't do what they said they did? Other than the testimony, there is no evidence because we only had what they produced. Well, then they, then you can hardly fault the district court for accepting evidence when there's no counter evidence. There is the testimony from Ms. Davis and Jamal Mack that said when we asked for help, help was not given. When we made complaints, our complaints were ignored, to paraphrase. And viewing that evidence, that testimony in the light most favorable to plaintiff for the district court to say, we're not going to second guess what Alwyn is doing because that was a treatment decision, that just seems inappropriate. What's your understanding of the adjustment in the treatment plan? Was it a medical one by medical doctors or was it we'll put them to bed earlier or we'll tell them to, I mean, what was the treatment plan? So the treatment plan. The adjustment, I'm so sorry. What was the adjustment in the treatment plan? As I read the treatment plan, it's hard to see where Patient X started and where he ended up. The treatment plan was submitted, and I believe Your Honors have it as part of the evidence submitted in the lower court under seal. Not that it's under seal for you, but it doesn't, it's not very comprehensive. Do we need to get into that to decide this case, or is that putting us in exactly the wrong spot, which is trying to guess what's the appropriate treatment for a deeply disturbed individual? I mean, if we, everybody seems to accept, so why shouldn't we accept Patient X was a deeply disturbed individual? Does your winning this case depend on our making a judgment about the quality of Elwynn's medical treatment and medical judgment with respect to Patient X? No, I do not think that is necessary. I think the question here, which would be the question for the jury, is Elwynn liable for his behavior? That's certainly the question. The question, though, is you seem to be couching it, and maybe your opponent is drawing you into this as well. You seem to be saying they didn't do enough to treat him. Isn't the real question here whether they did enough to control and protect him within the confines of the particular circumstances of a lockdown psych ward? No? I think yes. We're saying they didn't. They're saying they did, which makes it a clear dispute here. Well, and that's why you've got to get into the facts, and there is a factual record now. I took the most dramatic incident and put it to your opposing counsel in what I think were the starkest terms favorable to your client. But, of course, the district court isn't just looking at one incident to decide whether there's a hostile work environment, right? There's a whole history here to deal with, and there's a specific question about whether the rest of that history is such as to justify your client from saying, well, I'll quit, or I'm not doing that, disobeying a direct instruction from a supervisor. Yeah, maybe I was too long a question. I'm sorry. Is the fact that you have a really bad event a sufficient basis to be able to say, yeah, I know I'm supposed to do what I'm told here. In fact, I can get fired for not doing what I'm told here, but I have the option of walking off the job and suing you, and I choose to do that. Is one really bad event enough to justify her walking off the job and just abandoning her post? Well, as Ms. Davis testified, it was do it or go home. She took the or go home. She didn't actually believe. Did she believe or go home is the legal position that you're taking? She thought or go home just meant, yeah, you can go home now and no repercussions. He was tapping out, which was the suggestion I made. He told her not to tap out. He told her go back and take care of it or go home. In context, it certainly sounds like she was being told, yeah, you can walk off your job, but you're not going to have a job. Now, maybe you're suggesting that that's a question of fact. Did she not understand if she didn't do it, her supervisor, instructor, she was going to get fired? I think that is a question of fact because if she was being told by her supervisor to put herself in someone who has harassed her, assaulted her, treated her terribly since she started this job, who is telling her do it, you're going to get fired, and her supervisor said do it or you're going to get fired or tap out. Well, it wasn't or tap out. I think you just summed it up. He said do it, in effect, or you're going to get fired. He, you know, in what certainly appears to maybe a person reading it in the cold light of day, Moody's judgment can be second-guessed a lot, but he took patient X's side in this and she chose to walk off the job. And I guess the final question I'm trying to put to you is in that context, is it a hostile work environment when you have a really bad day and your supervisor tells you to do something and you say, no, I'm leaving? I think yes. Okay. Okay, well, we appreciate counsel's argument. Thanks very much. We've got the matter under advisement and we'll recess court. Thank you.